Filed 5/21/26  In re R.P. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re R.P. et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>K.L.,<br><br>     Defendant and Appellant. | A173938<br><br>(Contra Costa County<br> Super. Ct. No. J2400106,<br> J2400107) |

K.L. (mother) appeals an order terminating her parental rights to her two young daughters, R.P. and A.P., and selecting adoption as the children's permanent plan under Welfare and Institutions Code section 366.26.[1] Mother contends the trial court erred in applying the parental-benefit

---

[1] All statutory references are to the Welfare and Institutions Code.

1

exception.[2]  (§ 366.26, subd. (c)(1)(B)(i).)  We find no error and affirm the order terminating parental rights.

# I.

# BACKGROUND[3]

## A. Prior Dependency Proceedings

### 1. First Dependency Case

In 2017, the juvenile court asserted jurisdiction over parents' two eldest children, L.P. and K.P., born in 2015 and 2016.  Eventually, parental rights over the eldest two children were terminated in 2018 and the children were adopted by a family in Idaho.

### 2. Second Dependency Case

Parents had a third child, R.P., who was born in 2019. In January 2020, dependency jurisdiction was taken over R.P. due to parents' substance abuse and mother's mental health issues.  Parents later regained custody of R.P. and the case was dismissed in April 2021.

## B. Current Dependency Proceeding

### 1. Detention and Jurisdiction

A.P. was born in late 2022.  In February 2024, the Contra Costa County Children and Family Services Bureau (bureau) filed a petition that, as later amended at the jurisdiction hearing, alleged A.P. had been found nonresponsive and not breathing, had received two doses of Narcan, and

---

[2] Andrew P. (father) does not separately appeal or otherwise join in mother's appeal.  At times, we will collectively refer to mother and father as "parents."

[3] We take part of the background facts from parents' writ petition challenging the setting of the section 366.26 hearing.  The writ petition, which challenged the bypass of reunification services (§ 361.5, subd. (b)(15), was denied by this court.  (*K.L. v. Superior Court* (A171304, Dec. 18, 2024 [non. pub. opn.].)

2

tested positive for fentanyl. A.P. was in the hospital. The bureau further alleged that parents had previously failed to reunify and had their parental rights terminated as to their two older children—L.P. and K.P. When asked about the incident with A.P., mother said the child had choked on a pepper. Mother did not know how fentanyl got into A.P.'s system.

A.P. had a medical history of failure to thrive and fell in the 0.1 percent and 0.3 percent for weight and head circumference. A.P. also had feeding issues.

The juvenile court sustained the bureau's allegations that R.P. and A.P. were at substantial risk of harm and ordered the children detained in February 2024. The children were placed with a paternal great aunt in March 2024.

At the jurisdiction hearing in April 2024, parents pleaded no contest to the counts regarding A.P.'s ingestion of fentanyl and the termination of parental rights of the older siblings.

*2. Disposition*

The bureau's May 2024 disposition report recommended that pursuant to section 361.5 subdivisions (b)(10) and (11), services not be offered to parents because they had not addressed the problems that led to the removal of their two older children (L.P. and K.P.) and pursuant to section 361.5, subdivision (b)(15) because parents had previously willfully abducted L.P. and K.P. from their placement and refused to disclose the children's location or return them to their placement or the social worker.

The juvenile court denied reunification services and set a hearing pursuant to section 366.26. In reaching this determination, the court indicated there was no doubt that parents loved the minors but found there was an insufficient showing that parents had made reasonable efforts to

3

address the issues that led to their first dependency case and that persisted in this case. When father said he wanted to get a bonding study, the court said it was not sure one was necessary because "everybody agrees there is a bond between parents" and R.P. in particular.

*3. Supplemental Petition*

In October 2024, the bureau filed a supplemental petition seeking a new placement for R.P. and A.P. because the paternal great-aunt was no longer able to care for the children. Following a contested placement hearing, the children were moved to a confidential resource family home.

In December 2024, the bureau made an ex parte application to have the children placed in Idaho with the family who had adopted the children's older siblings.

*4. January 2025 Section 366.26 Report*

In January 2025, the bureau submitted a section 366.26 report, recommending termination of parental rights and adoption as the permanent plan for R.P. and A.P.

The report reflected that R.P. had been in therapy since September 2024; mother participated in the therapy until November 2024. A.P. was then two years old and was in the process of catching up on vaccines after mother refused them for two years. Due to A.P.'s feeding issues, her gastroenterologist recommended medication to increase A.P.'s appetite, but mother refused to allow the medication; A.P. continued to meet with a feeding therapist. A.P. was developmentally delayed and received physical therapy for a few months, and was treated by an infant development specialist. A.P. was scheduled to begin speech therapy.

Parents visited once or twice a week for a total of two hours.

4

The majority of visits occurred with no incidents, however, there were several in which R.P. would not follow parents' instructions and would run around the lobby or up the stairs, hit mother, throw toys, walk ahead of adults outside, or would have a tantrum. R.P. also had strong reactions to the visits ending. The social worker believed it was due to not having a strong healthy bond with the parents.

During the visits, A.P. played on her own and did not look to the parents for help or attention. A.P. did not have any problem with the visits ending and reached out to her caregiver to be held.

The children had a strong sibling bond. The adoptive parents of the older siblings were interested in having R.P. and A.P. placed with them.

*5. Addendum Report*

In a February 2025 addendum report, the bureau reported about visitation since the section 366.26 report: three out of five visits occurred with no notable incidents. On one visit, R.P. wanted a hamburger and threw herself on the floor when mother told her she would bring healthier food next time. R.P. cried when parents left. On another visit, R.P. took the tablet after mother told her not to. R.P. told mother that she and father "weren't her family anymore."

R.P. did not listen to parents' redirection when she jumped on the couches and chairs. She screamed and had a tantrum when mother threatened to delete an app on the tablet.

The report indicated A.P. was too young to understand the concept of permanency. She had no difficulty leaving after visits with the parents. R.P. knew mother and father and enjoyed visits with them. The social worker opined that the relationship between R.P. and the parents was not healthy. R.P. had poor boundaries and did not follow parents' directions. The bureau

believed the children were adoptable and the adoptive parents of the older siblings in Idaho were willing to adopt A.P. and R.P. The girls were reported to have a significant sibling bond. The girls had been out of their parents' care for eleven months.

*6. Mother's Letter to the Juvenile Court*

Mother wrote a letter to the juvenile court in response to the bureau's January 2025 section 366.26 report. Mother requested that A.P. and R.P. remain in long term foster care. Mother wanted to keep the relationship and bond the parents had with the girls and be a part of their lives growing up. Mother objected to the girls being placed out of state with the older siblings because the older siblings were adopted before A.P. and R.P. were born and there was no bond between them.

Mother reported that all the visits she and father had with the girls were loving and appropriate and that the bureau's memorandum was biased, disturbing and unethical. She described R.P. crying for mother at the end of visits. She said R.P.'s therapist said mother's presence during therapy was in R.P.'s best interest, but the social worker would not allow mother to continue attending the sessions. According to mother, R.P. told the therapist she would be sad and scared if mother could not attend therapy. Mother reported that R.P. told the therapist that mother made her feel happy and loved.

Mother's letter stated that the bureau's report that the girls did not have trouble saying goodbye was not true because the girls were distracted by food and tricked into leaving before the parents could say goodbye. Mother wrote that R.P. counted down the days between visits and wanted more phone time with parents. Mother speculated that the bureau had a pre-existing relationship with the adoptive parents in Idaho that made the

bureau biased, or that the adoptive father used his influence as a retired police officer to have the children placed in his home.

*7. Placement in Idaho*

Following a multi-day contested placement hearing, the juvenile court followed the bureau's recommendation for the children to be placed in Idaho with the family who had adopted parents' two older children.

In a March 21, 2025 memorandum report, the bureau reported that when R.P. learned she and A.P would be moving to Idaho with their older siblings, she "screamed in excitement." The bureau reported that on March 4, the potential adoptive parents flew to California and met R.P. and A.P. The next day, both girls were happy and comfortable playing with the foster parents before they left for the move to Idaho.

The social worker spoke with R.P.'s therapist who said that R.P. had an understanding that she would not be going back to her parents. R.P. called the foster parents mom and dad or by their first names. R.P. told the foster father she was going to miss her mom and dad. R.P. cried for a few minutes twice in the prior week and said she missed and loved her mother. She also cried one day before school and again said she missed her mom. In both instances the foster mother comforted R.P. with hugs.

## C. Section 366.26 Hearing

The section 366.26 hearing took place over the course of several days, during which the bureau filed additional memoranda regarding various developments.

*1. Social Worker's Testimony*

Social worker Stella Truong testified parents consistently visited R.P. and A.P. both in person and in video calls. Parents were loving and appropriate with the girls during visits. The girls were excited to see mother

and father.  The social worker noticed a positive bond between the children and parents.

The social worker considered whether not seeing the parents again would have a detrimental effect on R.P.  Her assessment was that there was a parent/child bond, but she thought permanency was important for the girls.  She said it could have a detrimental effect on R.P., but she knew the family would allow contact if R.P. or A.P. wanted it because the family allowed email between the older siblings and parents.

The social worker testified that during one video call, mother insisted an older sibling be called by the name mother preferred, and that the people who took the older siblings were now taking R.P and A.P.  At the end of the call R.P. was whimpering after mother said, " 'You know me.  I raised you.  I did everything I could to get you back.' "

Following a break in the social worker's testimony, the bureau requested authority to suspend visitation due to a call on March 24, 2025.  The court was "very disturbed" by the call's transcript and by mother's behavior and statements.  During the call, mother told R.P. that the caregivers were not her parents and criticized the foster mother's parenting of one of the older siblings.  Referring to the caregivers, mother said, " 'I'm sad that these people did whatever they did to take you away . . . .' "  The court suspended further visitation but gave the social worker authority to restart visits.

When the social worker resumed her testimony, she stated that when a scheduled visit had been cancelled, R.P. said, "oh, okay," and did not cry or ask when a visit would next occur.  There were no reports that R.P. asked for visits with mother or father since she was placed in Idaho.  On two occasions, in the first two or three weeks after the move, R.P. cried for a few minutes,

indicating she missed her parents but after her feelings were acknowledged she moved on and did not dwell on it.

The social worker testified that R.P. began an April 4, 2025 video call showing a toy to mother. Mother did not acknowledge the toy, but said, "I've never been mean to you have I?" Later, R.P. told mother she was excited she got a haircut and mother started to say, "what I'm upset about is that these people . . . ." R.P. interrupted her and said, "I am still powerful Mom, please don't do this again. I don't like this a lot. I don't like it so much when you do this. It makes me sad." R.P. then started crying and hugged the caregiver and did not want to let go of her. R.P. said she was sad and wanted love from the caregiver. R.P. had no trouble ending the visit and stopped crying.

The social worker testified it was very difficult for R.P. to build relationships with other people because of her loyalty to the parents or due to what mother said during video calls about the current caregivers. R.P. loved her parents, but it made it difficult for her to settle and be in a stable environment or integrate with a family because she was in "limbo." It was confusing for R.P. because mother was "telling her one thing and then, here [] she is with a family that she enjoys and just . . . thriving."

The bureau was concerned that mother did not acknowledge or recognize R.P.'s feelings and that mother was not able to demonstrate that she could empathize with R.P. The bureau recommended adoption over legal guardianship because it was more beneficial for R.P. to be adopted given her emotional and mental health and her efforts to integrate with the family. The social worker reiterated that R.P. was in "limbo," where she was trying to figure out what was true given what parents have told her.

## 2. R.P.'s Former Therapist

Marissa Anderson testified that she had conducted 20 therapy sessions with R.P. Mother attended the first seven sessions. The therapist did not observe any concerns in the interactions between mother and R.P. The therapist said she could not determine bonding as it was out of her scope of practice.

During therapy, R.P. brought up her frequent placement changes and expressed distress about the moves. The therapist reviewed the transcript of a video call between the parents and children after the children had moved to Idaho. The therapist was concerned because R.P.'s dysregulation was evident and she was trying hard to have mother reconnect with her to show her things, but mother was not focusing on those things. The therapist recommended that future calls focus on R.P. and not parents.

## 3. Visitation Supervisor

Mailah Wayne, a social casework assistant for the bureau, supervised visits between dependent children and their parents. She supervised visits between parents and R.P and A.P. from January to March 2025. The former visitation supervisor did not relay in the case notes any concerns about prior visits. The visitation supervisor testified that both girls were extremely comfortable with both parents. She did not observe R.P. having a tantrum or getting upset more than an ordinary five or six year old. She said parents managed her well if she got upset. Mother would talk to R.P. and R.P. would come around.

The visitation supervisor observed a positive, natural bond between the children and their parents. Mother's interactions with R.P. were engaged and positive. She never saw mother do or say anything inappropriate.

10

During the last in-person visit before the children moved to Idaho, parents and paternal grandparents celebrated R.P.'s birthday. They were loving and doting on the girls and the girls were extremely comfortable and familiar with them. R.P. cried during the middle of the visit, which caused everyone else to cry. Mother did her best to console her. At the end of the visit, it was not difficult for R.P. and A.P. to separate from their parents. R.P. was not sad at the end of other visits and she did not cry.

The visitation supervisor testified the paternal great-grandfather approached her outside the courtroom and intimidated her by looking her up and down and saying "unbelievable" to her.

*4. Paternal Great-Grandfather*

Paternal great-grandfather, Oscar M., testified that he observed positive interactions between parents and the girls. He testified that the visit supervisor cried during the last in-person visit and told him she wanted to resign because of the "injustice" of this case. She said she could not handle seeing how the children loved their parents so much and the agency was unjust; the visit supervisor also said another person was resigning. He testified the visit supervisor said the children had a very strong bond with parents.

Paternal great-grandfather testified that he never talked to the visit supervisor on the day of the hearing, but he said it was "unbelievable" that she wanted to testify. He denied directing the "unbelievable" comment to the visit supervisor. Instead, he said he was directing the comment to mother.

*5. Additional Memoranda*

In a July 10, 2025 memorandum, the bureau reported about ongoing visits and the new placement in Idaho. The social worker supervised 13

video calls between parents and A.P. and R.P. from April to July.[4] Overall, there were no issues; however, mother would ask the girls if they had certain things that mother had given them and would ask where the items were located. On one occasion mother said she thought R.P. was "sad" and pressured her for a response. When parents would tell the girls they loved and missed them, R.P. would typically change the subject, although occasionally she would say "me too," or say she loved and/or missed them.

When R.P. brought up the issue of A.P.'s overdose and drugs in the home, instead of being transparent, parents told R.P. not to believe what anyone told her and that they were not bad people. During two calls, parents were very emotional and made accusations against the caregivers. According to the foster mother, after the video calls, R.P. was "upside down" and "amped up" for at least two days; she would not listen and would be highly sensitive.

The bureau reported that the girls were doing well, but R.P. had many challenges, including not listening, pushing A.P., and not wanting to share with A.P. R.P. lacked discipline and structure and constantly needed redirection. R.P. wanted to make decisions and force people to do as she wanted. R.P. said her parents told her she could do that.

The bureau reported that R.P. had weekly therapy sessions with Stephen Gibson. He reported that R.P. expressed strong desires to reunite with mother and father. R.P. idealized her parents, especially mother. The therapist said the weekly phone calls from mother were emotionally dysregulating and afterward, R.P. demonstrated increased hyperactivity, clinginess and emotional volatility.

---

[4] The bureau included transcripts of the video calls.

R.P. was presenting with attachment challenges, hyperactivity and impulsivity. The therapist opined that R.P. resisted accepting or attaching to the foster parents due to unresolved grief, loyalty conflicts, and "trauma bonding" with her biological parents.

In a July 24, 2025 memorandum, the bureau updated the court with additional information from therapist Gibson. He told the bureau that R.P. maintained a strong emotional connection with her parents, particularly mother. However, he believed the attachment was "insecure or trauma-based, rather than protective or secure." He did not believe the attachment was consistently positive or emotionally regulating. Therapist Gibson opined that R.P.'s response after parental contact of emotional dysregulation, clinginess, hyperactivity, and confusion suggested that ongoing interaction with mother was destabilizing. He said R.P. would likely experience some degree of grief and emotional distress if contact were reduced or terminated but that it was not necessarily indicative of long-term harm. The ongoing exposure to emotionally ambiguous and invalidating contact reinforced R.P.'s entitlement-based beliefs, disrupted her ability to regulate her behavior and undermined her adjustment to her prospective adoptive home.

Therapist Gibson did not believe maintaining contact with R.P.'s biological parents outweighed the importance of permanency and stability. While R.P. may experience sadness, confusion, or behavioral regression, it did not outweigh the long-term psychological benefits of being in a structured, emotionally safe, and stable home environment.

He opined that the current parental contact was contributing to emotional instability and preventing her from fully investing in relationships with her adoptive caregivers. He said continued confusion about roles,

13

loyalty, and expectations was a barrier to healthy identity development and emotional growth.

### D. Juvenile Court's Ruling

The juvenile court found by clear and convincing evidence that the girls were adoptable and that they would be adopted by the current caregivers. The court explained that for the parental-bond exception to overcome the legal preference for adoption, the following prongs must be satisfied: "That there has been regular visitation and contact . . .; two, that there exists a substantial positive relationship, the continuation of which would benefit the children; and prong three, such that the termination of parental rights would be detrimental to the child, weighing the detriment of severing the relationship versus the benefits of adoption."

The court acknowledged that prong one of the parental exception was met as the parents attended nearly every visit. The court found there was insufficient evidence that A.P. had a bond that rose to the level to satisfy prong two, that there was a substantial positive bond from child to parent, the continuation of which would benefit the child. The court found R.P. was "clearly bonded" to parents, especially to mother. However, there were unhealthy attachment issues from the beginning of the case. While the court agreed that there were "very positive aspects" to the video calls, and it was abundantly clear how much parents loved the girls and how much R.P. loved her parents, in almost every visit, R.P. appeared so "consistently anxious" about her parents' happiness that it was like she was "walking on eggshells." The court noted there is "a level of toxicity" that undermines parents' arguments.

The court quoted from the March 24 visit during which mother stated she was sad that " 'these people did whatever they did to take you away,' "

and R.P. asked mother to " 'turn yourself back to happy.' " Mother agreed to turn herself " 'back to happy' " for R.P, while telling her that " '[t]he people you are living with are trying to cut off communication with me completely.' " Mother added, " 'I will keep fighting for you.' " Then, a few moments later, mother asked R.P. if she was " 'being treated nicely?' " When R.P. nodded yes, mother said, " 'they are not treating you nicely?' " Mother continued to imply the foster parents did not care about R.P. and said the foster parents were " 'not good people.' " When R.P. told mother she was " 'making me sad,' " mother replied, "I know . . . [b]ut . . . [o]ther people are trying to make you not talk to me.' "

The court found that parents continued to tell R.P. that she should not trust the foster parents. The court stated that the parents were prioritizing their possession and control of the children over the children's need for stability and safety. Nevertheless, the court emphasized: "I want to make it clear that no one, least of all the Court, thinks that the parents are bad people. That has come up a few times. Nobody thinks that mom and dad are bad people. And I know that they love their children very, very much. They are struggling with substance use issues and trauma that have been plaguing them for some time, but it doesn't mean that they don't love their children. But they still have not come to terms with the fact that it is not due to any bias on the part of the authorities, or desperate grasp of the adoptive parents, that they lost their children. It has been solely due to their significant substance abuse issues." The court could not find that the bond was positive or that a continued relationship would have a benefit for the children. Therefore, prong two did not weigh in parents' favor.

The court ruled that prong three weighed heavily against parents as their actions undermined the stability of the girls' placements and had a

15

destabilizing impact on R.P.  The court acknowledged, "[I]t will be detrimental to [R.P.] to lose contact with her parents, and I think everybody recognizes that, and that's what makes this case so incredibly sad," but "that fact is outweighed by the benefits of stability and safety that R.P. will experience through adoption."  The court stated, "I do not find that the harm of severing the relationship between either of the girls outweighs the security and sense of belonging that a new family could confer, especially a family containing . . . two of their full biological siblings, who have been through similar experiences."  The court terminated parental rights and this appeal by mother followed.

## II.

## DISCUSSION

### A. Applicable Law and Standard of Review

The purpose of the section 366.26 hearing is to select a permanent plan for the child after reunification efforts have failed.  (§ 366.26, subd. (b); *In re Marilyn H.* (1993) 5 Cal.4th 295, 304.)  Adoption, where possible, is the permanent plan preferred by the Legislature for a dependent minor child who has not been returned to the custody of his or her parents and is found by the court to be adoptable.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).)  Only in "*exceptional circumstances*" may the court "*choose* an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  The parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i) is meant to recognize parent-child relationships that "promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  The exception "must

16

be examined on a case-by-case basis," considering the many variables that may affect the parent-child bond. (*Id.* at pp. 575–576.)

To satisfy the exception, "a parent must prove *all three* components of the beneficial relationship exception," and a "failure of proof on any one of them is fatal." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10.) The parental-benefit exception requires a parent to establish by a preponderance of the evidence that (1) "the parent has regularly visited with the child," taking into account the extent of visitation permitted; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 629, 636 (*Caden C.*); § 366.26, subd. (c)(1)(B)(i); *In re I.R.* (2014) 226 Cal.App.4th 201, 212.) The first element asks whether there has been regular visitation. "Regular visitation exists where the parents visit consistently and to the extent permitted by court orders," not merely that there have been parental visits. (*In re I.R.*, *supra*, 226 Cal.App.4th at p. 212.) The second element asks whether "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The relationship may be impacted by several factors, such as the "age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

We review the juvenile court's findings on the first two elements for substantial evidence, wherein this court will uphold the trial court's determinations if we find substantial evidence supporting the juvenile court's

17

finding, " 'even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

With respect to the third element, we review the factual determinations underlying the juvenile court's balancing for substantial evidence, e.g., "rang[ing] from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  However, the "ultimate decision" of whether termination of parental rights would be detrimental to the child requires the trial court to "engage in a delicate balancing" and exercise its discretion. (*Ibid.*)  The third element is thus properly reviewed under the abuse of discretion standard, wherein the trial court's decision will be overturned only if the decision " ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at pp. 640–641.)  This hybrid standard "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Id.* at p. 641.)

## B. Analysis

Mother argues that her parental rights should not have been terminated because the juvenile court improperly analyzed the second and third prongs of the parental-benefit exception.  Alternatively, she contends she satisfied all three of the prongs of the parental-benefit exception.  We disagree.

Preliminarily, the record reflects the court carefully and thoughtfully analyzed the second and third prongs of the parental-benefit exception.

18

Mother's dissatisfaction with the court's ruling does not undermine the court's thorough analysis of the second and third prongs.

Here, there is no dispute that R.P. and A.P. are adoptable and that the foster family, who had adopted their two older siblings, intended to adopt them. The record also establishes that mother maintained regular visitation with R.P. and A.P. so as to satisfy the first requirement of the exception; the first prong is not contested on appeal.

The court found there was insufficient evidence that A.P. had a bond that rose to the level to satisfy prong two, that there was a substantial positive bond from child to parent, the continuation of which would benefit the child. In contrast, the court found R.P. was clearly bonded to parents, especially to mother. However, there were unhealthy attachment issues that were evident from the beginning of the case. Substantial evidence supports the juvenile court's determination on the second prong, when considering factors such as the portion of the child's life spent in parental custody and the child's particular needs. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

As noted, the juvenile court found that mother's relationship had a negative impact in that R.P. was "consistently anxious" about mother's happiness. Also, the "level of toxicity" in the relationship caused R.P. to act as if she were "walking on eggshells." Indeed, therapist Gibson opined that the attachment was "insecure or trauma based," rather than being protective or secure. Also, R.P.'s dysregulation, clinginess, hyperactivity, and confusion following visits suggested that ongoing interaction with mother was destabilizing. Gibson further opined that parental contact was contributing to emotional instability and preventing R.P. from fully investing in relationships with her prospective, adoptive caregivers. He noted that

19

continued confusion about roles, loyalty, and expectations was a barrier to R.P.'s healthy identity development and emotional growth.

Mother cites evidence positively reflecting on her relationship with the children. However, under the substantial evidence standard of review, the court looks for substantial evidence supporting the juvenile court's finding, regardless of substantial evidence against it. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) There is substantial evidence supporting the juvenile court's finding the children would not benefit from a continued relationship with mother.

Turning to the third prong, the juvenile court concluded, "I do not find that the harm of severing the relationship between either of the girls outweighs the security and sense of belonging that a new family could confer, especially a family containing . . . two of their full biological siblings, who have been through similar experiences." This determination is supported by social worker Truong's testimony that the termination of parental rights and adoption by the caregivers would be in the best interests of the children because it would provide stability, the ability to integrate with the family and remove the state of emotional limbo R.P. is in based on what parents continue to tell her. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1159 [a juvenile court can rely on opinions of a social worker, who is an "expert qualified to testify concerning risk assessment and permanent placement issues," when balancing the various factors relevant to the third prong of the *Caden C.* test].)

Additionally, therapist Gibson opined that maintaining parental contact did not outweigh the importance of permanence and stability; these long-term psychological benefits outweighed any sadness R.P. might experience. Criticizing this opinion, mother argues that Gibson "cannot predict" the future, and that his opinion that the benefits of permanency and

stability outweighed continued parental contact was a "conclusion for the court to make," While no one can predict the future, therapist Gibson's opinion was not merely speculative but was informed by his training and experience and his weekly sessions with R.P.

The record further reflects that the children had been out of mother's care for more than one year of their young lives. In A.P.'s case, this meant she had spent more than half her life out of mother's care. And, while R.P. had spent more time in mother's care, she had spent nearly a year and a half "walking on eggshells" so as not to upset mother at the expense of her need for stability and permanence.

Mother highlights evidence of the bond she had with R.P. and R.P.'s "sadness" while being away from mother. However, the inevitable sadness that follows when children are separated from their biological parents is insufficient evidence that severance of the parental relationship would harm R.P to such a degree so as to defeat the benefits of adoption. The record is devoid of evidence regarding *how* the severance of that relationship would harm R.P. As the court in *Caden C.*, *supra*, 11 Cal.5th at page 636 explained, it is the parent's burden to establish by a preponderance of the evidence that terminating the child's beneficial attachment to her parent "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." Mother, however, did not testify at the section 366.26 hearing or present any other testimony from expert witnesses, service providers, family or friends to support a finding that termination of her relationship with her daughters would be detrimental. Accordingly, mother did not satisfy her burden.

Notwithstanding mother's efforts and obvious love for her children, the bureau's reports, the social worker's testimony, and the opinion of R.P.'s

treating therapist demonstrate that it was not arbitrary, capricious, or patently absurd for the juvenile court to hold that any detrimental impact to R.P. and A.P. from terminating mother's parental rights would not outweigh the benefits of permanent adoption.

Given the witnesses' testimony and the lengthy written record, we reject mother's contention that the juvenile court abused its discretion in failing to apply the parental-benefit exception.

## III.
## DISPOSITION

The order terminating parental rights is affirmed.

_____

Moorman, J.*

WE CONCUR:


_____

Brown, P. J.


_____

Streeter, J.


A173938/*In re R.P. et al.*

---

* Judge of the Superior Court of California, County of Mendocino, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.